Mr. Steven J. Roeder, on behalf of Mr. DePodesta, Mr. Stewart P. Fosco. Mr. Roeder, you may proceed. Thank you. Good morning. In Kerrigan v. Unity Savings, the Supreme Court could not have been clearer. It held that if the doctrine of business opportunity is to possess any vitality, the corporation must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is incident to its present and prospective operations. Kerrigan also couldn't have been clearer of what happens when you fail to honor those disclosure obligations. The fiduciaries foreclosed from exploiting the opportunity on his behalf. This Court's controlling authority is equally clear. It defines a corporate opportunity as a proposed activity that's reasonably incident to the corporation's present or prospective business and in which the company has the capacity to engage. That's Annis v. Ardino. That's Lindenhurst-Jones v. Becker. Had the trial court followed this binding precedent? Could I ask a few questions? Yes, sir. And then the third was 20 percent of whatever the contract profits were? Yes, but actually... Is that all the damages you were asking for? Judge, we're asking for the discouragement of all benefits, and the benefits included $2.5 million worth of fees, included the 20 percent profit interest, and included, frankly, any benefit which would include the amount that they were indemnified or the legal fees were advanced. Because if a fiduciary can get essentially insured for breaching his fiduciary duty, then the incentives to breach are extremely high. And so we just asked for discouragement of all benefits, and those were benefits that we specifically requested. And you're saying that they were insured because they entered into an agreement with a third party to indemnify them and hold them harmless, ruining their breaches? The management agreement they entered into with Merced agreed to indemnify them as officers or directors, and Merced advanced $1.5 million towards the defense of this case. So had the trial court followed binding precedent from this court and the Supreme Court, it would have been required to deny the motion for directed finding on Count 5, index usurpation of corporate opportunity claim. It would have been required to enter judgment in favor of index, and it would have been required to find that the pedestrians, Alstrom, were foreclosed from exploiting the opportunity they failed to disclose. Counsel, didn't the trial court grant defendant's motion for a directive verdict on Count 5 back in April of 2017? It was a motion for directed finding at the close of the state's evidence. They directed it, and you didn't raise that issue with the court until when? Were you objected to their grant of the directed finding? Well, we objected to the grant by filing an opposition to it, Your Honor, and we also moved to reconsider to correct an error of law. Okay, that's what I mean. I'm referring to the motion to reconsider. Yes. That wasn't filed for over a year. Is that correct? That's correct, and what we did is we tried to file it so that the trial court could consider all of these issues at once as it ruled on the case. We, of course, had an opportunity to wait after the ruling to move to reconsideration, but we asked that the court would look at it in connection with the entire case, and that's why we brought it at that time. All right. Counsel, what did the defendants take from your client? They took the opportunity, Your Honor. What opportunity? The opportunity, which is the proposed activity, which is the partnership with Merced, and it belongs to our client. My client, under this Court's decisions in the case. Okay, but here's my question. If that's what they took, why was that not available to you later? Judge, because I don't know if it's available or not, and I respectfully think that that is not the test, because what we know under the Court's decisions is that once you show a proposed activity that's in your line of business, it belongs to the company. So whether it was or was not available later is not relevant to the initial decision as to whether or not it was taken? That's correct. Okay. That's our position, because in Lindenhurst and in Annist v. Audino, that, once you show a proposed activity, that belongs to the company. The company has the first opportunity to exercise it. That's what the cases hold. What was really the nature of your relationship with Merced as well as Carson Bay at the time, or at the opportunity? Yes, Carson Bay is an affiliate of Merced. We entered into a mutual confidentiality agreement with Carson Bay, which bound its affiliates, which related to the development of projects in IRCA. And that was entered into in March of 2013. So in connection with the proposed activity, once we've shown that it is a proposed activity which INDEC had the capacity to engage with, which Mr. Dahlstrom admitted on the very first day of trial, and we've shown that they didn't disclose it, frankly, that should be game, set, and matched under this Court's decisions under Annist and under Lindenhurst drugs. And so defendants moved on grounds that were, frankly, inconsistent. First, they said the opportunity to partner with Merced was never an opportunity for INDEC. Then they said it always was an opportunity for INDEC. Respectfully, I'm sorry, Your Honor. It's okay. Go ahead. And respectfully, once you show that it is a proposed activity under this Court's cases, it is something that belongs to the company. So when the trial court ruled that INDEC failed to introduce evidence that the opportunity to develop projects was an exclusive one, or that INDEC attempted to partner, that we didn't show that INDEC attempted to partner with Merced after the defendants resigned, it did not apply to the correct test, frankly. And that's the only ruling the Court made on directive finding. It didn't cite any case law. It made no statement that was considering evidence. It made no findings of fact. It therefore engaged in the first step of a two-step process in considering a motion for directive finding. What distinction, if any, is there between... I'll start again. How many breaches of fiduciary duty did the trial court find? Many, Judge. And we've listed them. They found that they were computing with INDEC while they were employees. They found that they downloaded thousands of documents for use in their business. They found that Mr. Dahlstrom had solicited folks to leave. They found they negotiated these management agreements. And all those breaches, other than the corporate usurpation, would have a different measure of damages? Judge, again, we weren't looking for damages as a loss. We were looking for a disgorgement. And when it involves a breach of fiduciary duty, it is not the loss to the principal that triggers the right to recover. It is the gain to the fiduciary. Chicago X. Raul Cohen v. King, Illinois Supreme Court case. And when you look, fiduciaries can't be allowed to benefit from breaching their fiduciary duty. The entire fiduciary duty law of the state has as a significant. Well, my point is, if they breach their fiduciary duty by competing with you, by using your facilities, your assets, then you'd be entitled to a disengorgement or refund or restitution. So you'd be entitled to the salaries that they were collecting, regardless of whether there was a usurpation of a corporate opportunity. Is that not correct? That's correct, Judge. That's correct. So my point is, over and above all the disengorgements, if that's the correct term, as opposed to disgorgements, I'm not sure which it is. But I like to call it restitution. I think it's easier for me to pronounce. And that's how the restatement sector refers to it. But what is the distinction between, if any, between the corporate usurpation and the other breaches? I would argue there really shouldn't be, except it's very clear under Kerrigan that you're foreclosed from accepting any of the benefit. And so that's a clear demarcation that the case is established that if you're foreclosed from taking, exploiting the opportunity, you are foreclosed from benefiting. Because otherwise, there's just not adequate incentive. And this case explains and shows why that is absolutely true. If all you have to do, once you are caught, once your employer finds out that you've engaged in this activity, is you just have to pay back that little bit of salary during the time the employer can show that you bitched your fiduciary duty. Meanwhile, you take millions of dollars in fees. How long does this window of restitution last? It would last, in our view, Judge, as long as the benefit directly flows from the breach. And they could have stopped it at any time, of course. They could have stopped developing these projects. How would they stop the 20% interest if the 20% interest hasn't been granted or given out or been effectuated up to the present time? Well, the 20% interest exists. They'd have a 20% whether that turns into something. I mean, it's like you have a stock and you don't know if the stock's going to be worth something. So my point is, how long does this accounting or this case last? Does it last 50 years? Does it last 10 years? What is the window of liability of these people for dischargement? I would say as long as it comes out of that 20% interest, Judge. And it would be as long as that would continue. Because the cases speak of eliminating the possibility of profit, not the probability. I'm talking about Graham v. Mims. I'm talking about E.J. McKernan and the Illinois Supreme Court's decisions. Otherwise, you have disloyal employees, as here, who try to structure their transactions in a way to avoid behaviorism. Didn't I read somewhere that you, the employer, don't have a property interest in these things? Not in our brief. Maybe you read it in their brief. No, I read it in a case. I don't know that case, Judge. I'm just concentrating specifically on this Court's jurisprudence in Lindenhurst drugs. Would it be an abuse of discretion for a trial court to deny it on the basis that the 20% interest would be speculative? I think it is an abuse of discretion. And I don't think that's a test. I think the test, frankly, would be manifest weight. But I do think it's against manifest weight because they have a 20% interest. And we know it exists. Whether it's worth something is different. So you pick 20% because that's their interest? That's correct. That's a benefit. That's the reason they were doing this. These projects can be very profitable, can be worth a lot of money. And otherwise, fiduciaries have an interest in structuring their transactions. But would there be an incentive? If the trial court had gone the other way, would there be an incentive to the defendants here to simply walk away from the project? Sure. And if they did, if they walked away from the project at that time and there were no profits, that they could document at that time and they completely walked away, then there are no profits. However, that's not the record that we have. The record that we have before this Court is that — No, but my point is, had she ruled that way, at that point they could say, well, we're done. We're not going to be paying off this for the rest of our days. We'll just walk away from the agreement and terminate our contract. They could have done that. And then that would effectuate or eliminate our ability to get the gains of the fiduciary duty as it relates to that 20%. Was there only one opportunity with this company? The opportunity that we alleged was an opportunity to partner and develop projects. And it's — I don't know if there's a second or third opportunity, and respectfully, I don't think that's — So, again, your position is it's irrelevant. I think it's relevant. And it could be — it could be relevant if you were looking at this as a damage remedy, if you're talking about something that would be — require a duty to mitigate. But that's not what fiduciary duty law requires. Again, it's the gain to the fiduciary that triggers the right to recover, rather than not the loss to the principal. And that is because the deterrent — I get that the first time. Of course. I just wanted to be sure that was your position. Yes. And so, Judge, our time is quickly evaporating, but — I wouldn't say evaporate. I would say exceptionally utilized. Okay. Thank you. But we proved every element of the corporate opportunity claim under this Court's jurisprudence. And so I would request that this Court reverse and remand with instructions for the Court to enter a judgment in our favor. We've shown that there was a proposed activity in our line of business — may I finish the question? Yes, Your Honor. A proposed activity in our line of business, in our actual operations, that they didn't disclose. And when they fail to disclose in this Court's decisions, that demonstrates the breach. And once they fail to disclose it, they are foreclosed from exploiting the opportunity. So for all these reasons, Your Honor, I'd request that — Your Honors, I'd request that this Court reverse and remand with directions. And I'm reserving five minutes for a vote. Yes, you may have it. Thank you. Thank you. I have a motion. Mr. Karaskoff, is that how you pronounce it? Karaskoff, yes. Thank you. Thank you. You may proceed, sir. Thank you so much. May it please the Court? Indict did not, in fact, prove the essential elements of a corporate opportunity case in Illinois. Judge, the trial court held after one year of trial, 13 trial days, that, in fact, there was no taking of an opportunity, which, in very part and parcel of the name of the cause of action, usurpation, was not done here. And the reason why, she stated as a matter of fact, was that the opportunity, be it somewhat amorphous, the opportunity to partner with Merced, was still available to Indict at all relevant times. Now, Indict believes that there's a timing issue here. That under Kerrigan, that if you simply don't inform your employer of the fact that you are going to do here what my clients did, and that is to take a job with a new entity, MHV, that there's no defense. And that's not the case. You still need to show that there was a taking. In all of the cases. You still need to show what? A taking, a usurpation of the opportunity. In all of the cases that are cited in both briefs, Lindenhurst, there was a franchise. In Comedy Cottage, there was a lease. In Vendo, there was technology for vending machines. You started out your proposition with corporate opportunity elements. What are the elements? Sure. The elements for a corporate opportunity is, first, there must be what we consider a concrete opportunity, something tangible that can, in fact, be taken. Second. Well, there was an opportunity here. Well, we disagree with that. What is it that your clients exercised? Our clients exercised their right, well-recognized right under Illinois law, to find new employment. And that's what they did. They contacted a representative from Merced seeking new employment and, in fact, found new employment. And the Court may, from the record, see that there was arguments over that, over whether it was a management type of an arrangement, whether there were salary, however it was. I do note that the trial court did use the word salary in her ruling. But be that as it may, they were looking for new jobs. And I think that while we talk a lot about public policy in this case, that is a policy that, as the Court well knows, is something that is sacrosanct in the State of Illinois. Counsel, didn't INDEC have the same opportunity to partner with Merced to develop this natural gas power development? I would like to know that, too, but that was never proven at trial. The burden of proof would be on the plaintiff to show that. There was literally, at trial, one comment made by an INDEC representative, the President Larry Legowski, who said, had they made this introduction to me, I would have got on a plane and talked to them. Well, that's not enough. We were asking the same question for the years of trial that we went through here. If I understand what you are saying, am I correct in concluding that your argument is that the contract, the agreement, the mutually beneficial agreement was not a contract that could be entered into by separate corporations, but it was an employment contract which the corporation, the plaintiff corporation, could not enter into because it could not be an employee? The answer to your question is yes. However, again, I get back to burden of proof. That would have been something that INDEC would have had shown at trial, whether it would be in the business of being the quote, unquote, employee. And that was never done. I don't know the answer to your question specifically because, as the record shows, and after our years of trial, that was never proven by INDEC. Well, isn't it of record that there was supposedly a signed agreement which had an indemnification clause and which provided for over a million dollars' worth of management fees, et cetera? If I may clarify, the answer to your question is there was an agreement. That agreement was to pay my clients, the appellees here, to manage these developments. But the indemnification clause in that agreement is something separate. I was just citing it seriato. My point is, is that you said there's nothing of record to establish that there was an agreement, I thought. And my point is, if that's the case, I don't know why they're asking for a million and a quarter dollars or asking for 20 percent of the profits because, according to you, they don't exist. The documentation doesn't exist for those things. Well, that isn't what I'm saying. And respectfully, you would ask me whether or not INDEC, the plaintiff in this case, could essentially fit in the shoes of being employees of this new entity, MHV. And my answer to you was I couldn't answer that because it was never proven at trial. We do know from the record that, in fact, INDEC is a development or was at the time a development company. We don't know from the record whether or not INDEC would be in the business of stepping into the shoes of managing a development company for another development company. And I think that that's what's really the amorphous nature of this opportunity is something that spills off the page to us because we never truly understood it. You'll note in the briefs that INDEC says that we rename the opportunity, the funding opportunity, because we had to because we never truly understood what opportunity was other than the president who said I would have got on a plane and met with them. Well, you called it an amorphous opportunity. And I don't know whether it's amorphous or not, but it is in writing, isn't it? And it was executed by the parties to the agreement, was it not? So at least there's hopefully a document that is an exhibit that is part of the record that we as a panel can reference relative to determining how the nature and extent of its amorphousness. Correct? The answer is there was an agreement between my clients and MHV for them to manage that entity. So that said, one of the things that I want to make sure that I highlight here, and if you would ask Mr. Roeder, had to do with the issue of what is the remedy here and what are the remedies. And I do note to the court that, in fact, INDEC did disclaim in a court order any money damages. So all it was seeking in this case was benefits or disgorgement of benefits. And in so doing, the trial court got it right. Although we disagree with the fact that my clients breached their fiduciary duties, the judge decided, and this was a matter of fact, that those duties terminated at the time of their resignation. And as a result of that, the benefits that my clients received after they left their employment would not be something to be disgorged and available to the plaintiff in this case. That's on the fiduciary duty. That is accurate, exactly. And I'm glad you pointed that out, because we do see these two causes of action as two very separate and distinct causes of action. And one of the things that we note in our briefs is the fact that when it comes to the breach of fiduciary account, that one of the things that the plaintiff had to prove was proximate cause, that there was somehow a nexus between what these breaches were while they were employed in INDEC vis-à-vis what transpired afterwards. And again, the trial court... This is all on the breach of fiduciary duties. That is accurate. Okay. And the trial court, again, after this was a three-year trial, had every opportunity to hear all of the facts and hear all of the testimony and made the decision that, in fact, that there was not a link or a nexus between the breaches that she found and what ended up being the benefits that my clients received after they left. And I think that's an important fact in this case. Similarly, we know that when it comes to the remedies that the plaintiff seeks, one is a constructive trust. And I want to make sure that I point out to the court that we believe also, again, I don't want to beat the dead horse, but the judge having the benefit of a very long trial, hearing all the evidence and testimony, made a ruling that, in fact, no constructive trust is available to the plaintiffs in this case. And her reasoning really is both a fact-based reason and a legal reason. From a factual standpoint, and I do point out again, the plaintiff's expert in this case testified that there's a potential here that the defendants will never receive a profit. In the energy development field, a profit is something that's highly speculative. And this is coming not from our expert, from the plaintiff's expert. And in so doing, the concept here is that it's one thing to suggest that potential profits can be put into a trust. But in this case, there's a chance there'll be no profits. And the cases in Illinois are very clear that when you're imposing a constructive trust, that, in fact, there are profits. These experts are testifying almost on an accounting basis of what they are collecting. The collection of a constructive trust, at least when it was granted as partial or complete relief, was a situation where the funds were actually expropriated. And it was a finite amount. And the court made a determination that the amounts that were expropriated improperly should be placed in a constructive trust. Now, it might have gone a little bit further if it was the Cohen versus Keene case. And the reason for the trust was because we were talking about taxpayers, I think, instead of just a homeowners association or something like that. But have you seen instances of a constructive trust that was imposed in instances other than expropriation? Only one case that's cited by the plaintiff, and that's the SNEP case, the U.S. Supreme Court case, which is distinguishable here. And in the limited time I have, I can tell you the distinguishing factor in that case. We had a former, I believe, CIA agent who had written a book and in so doing was revealing government secrets. And as a result of that, they shut that book down and profits were disgorged. And the court said, We have to issue a constructive trust because we understand that they might be writing a second book. And if we don't give them a constructive trust, we're going to have to go back to trial to prove damages later, at which time the government may be forced to reveal government secrets at trial. It's really limited in these facts. So the answer to your question is it's certainly not in Illinois. And the one case that the plaintiff cites is entirely distinguishable. If I may, in my concluding remarks, I know my time is coming up, one of the big And the policy argument that is a wrongdoer must be disgorged of all of the benefits that it receives, to distinguish all possibility of a profit. And I note to the Court that the case law in Illinois, there are cases in which that concept is discussed, but yet the case is remanded back to the trial court in order to determine exactly what profits are attributable to the wrongdoing of the defendants. Are you asking for remand? We are not asking for remand. I am simply pointing in terms of the distinguishing concept of the policy argument that's being made here. Of course not, Judge. We believe, again, that while the trial judge, we don't think there were breaches of fiduciary duty, we do believe that as we sit here today, the judge got the areas of law correct in terms of her application of corporate usurpation, or I should say rejecting corporate usurpation. On count one, on contract, rejecting that as being overbroad as a matter of fact and as a matter of law, also finding it to be unenforceable. And we also believe that on the fiduciary duty count, again, while we disagree with what she ultimately found, we believe that the disgorgement of salary was sufficient. Of course, counsel for index refers to it as a small amount of salary. And, of course, we respectfully disagree with that. We thought that this was quite a large hit by the trial court. And we also felt that it may even have been, as a matter of fact, more limited. But we do understand that, in fact, there should be no disgorgement of any benefits after my client's left and the trial court got it right. That's the reason why. Again, that's on the fiduciary claim. Forgive me, yes. That is on the fiduciary duty claim. The other thing, too, that I want to make sure, then, is we make the argument here in terms of the trailing obligations of a fiduciary. In their briefs, the plaintiff suggests that an officer of a company has a trailing obligation as a fiduciary after they resign. And that, in fact, does happen. And there are cases that show that. But those cases have, and again, the trial court had a chance to review this. In those cases, the officer's trailing obligations relate to the wrongdoing that they did when they were at their prior employer. And that wasn't the case here. Again, I hearken back to the fact that the trial court heard years of evidence and tested them. Counsel, you said it didn't happen when they were employed. Didn't they take advantage of this opportunity while they were still employed? Well, again, now we're talking in terms of corporate opportunity. The answer to your question is no. Again, and this goes back to a question that you were asking. The fact is they pled more than one opportunity in their complaint. One was this turban opportunity that was rejected by the trial court. With Carson Bay. With Carson Bay. That's correct. And is not on appeal here today. The other one was what turned out to be this partnership idea. The concept of Mr. Legowski saying I would have got on a plane had they told me about it. And our answer to that, may I continue? May I finish? My answer to that was that, in fact, the judge got it right. That that was not only an amorphous opportunity, but, in fact, it was never taken, which is an essential element of corporate usurpation. Why didn't your clients disclose that opportunity? Why did they not disclose the opportunity? As far as I recall from the record, one of my clients indicated it was a very emotional time for him. But the way that we, I understand. I do understand that. But one of the things that we posit here is the fact that these were new jobs. And I don't believe the law has a requisite that. So your position is this was never an opportunity. This was simply a new job. We're going here and we're going to work for this company now doing this. What I can say is, again, as a matter of proof on the record, that would be yes to the answer to your question. Okay. Thank you. And, again, I respectfully ask the Court to refer the trial court's ruling. Thank you. Thank you so much for your time. Mr. Roder. Thank you, Your Honor. May I have a second to just organize my notes? Okay. I guess I'll try to start at the end rather than at the beginning. Of course, they didn't disclose it because they knew if they had disclosed it that INDEC would have exercised this opportunity. They knew, as we all know, that when you have a $2 billion fund that has turbines at the ready, which then were valued at $60 million, and they want to develop projects with you in ERCA, that is such an enormous advantage. Of course, you would have accepted it, and you certainly wouldn't have allowed your management team, your development management team, to walk out with such an important development and decimate your ability to be a development company until you could replace that management team. Of course, INDEC would have accepted it, and they knew that they would have accepted it. Are you saying that Legowski would have jumped at the chance, even though he told everybody not to sign anything, until he released the contract? Sure. Of course, he would have jumped at this chance. And whether or not a Did he testify that he was going to jump at the chance? He did. He would have flown up to Minnesota. He would have talked to them. I'm sure he would have gotten a deal. He would have. Absolutely. Absolutely. But, you know, the idea of this Court's jurisprudence requires not just disclosure and tender, but it requires consent on full disclosure of the company to allow someone to take this opportunity. And, again, I noticed that Mr. Krauskopf did not answer the question of what are the elements of a corporate opportunity claim. Yeah, I noticed that, too. And those are clear. It is a proposed activity. It's vague, but that's what the case has said, a proposed activity. And the reason it has to be vague is because, as the Supreme Court held in the Mulaney case, once the employee goes out on his own, you don't know how this deal is going to end up, but once he starts working for himself, when he's got a duty to act solely on behalf of the interests of his corporation, he is in breach of his duties then. So it's a proposed activity. If you're operating in good faith, you say, hey, we got these people. They got turbines. They got $2 billion. They'd like to do a deal. Should we talk to them? And you know what the answer would be. They knew what the answer would be. The suggestion that they were looking for a job is just not supportable. The trial court denied their proposed findings that they were looking for a job. They didn't get a job. They set up a company. They were competing with Indec. While they were employees, the trial court found that. So it's not just a job. This court's decision in Consumers Company, a 1923 decision, but it's right on point, very persuasive. It's not that you can't get another job. You can't get this job. You can't set up a company to compete with your employer based on information that you've learned from your employer. So with respect to whether the duties did not terminate, E.J. McKernan is right on point. An officer has continuing liability for transactions that began during the employment and were based on information obtained during employment. It's all there, absolutely undisputed. Similarly, for Mr. Dahlstrom, he was competing while he was an employee. The trial court actually entered findings on this. And the result of the competition is they get this deal with Merced that their job was. Remember, they were hired to find partners for Indec. They found a partner for themselves. And so the result of all of this is that they obtained benefits in direct contradiction to this court's ruling in E.J. McKernan. Absolutely clear for Mr. D. Podesta, clear as well for Mr. Dahlstrom. They exploited their opportunities with the company. Clear on that. If there was a tortious interference with a contractual relationship, what would the damages be? If there were a tortious interference with the contractual relations, it would be the loss. It would be what? It would be the loss. It would be the loss of the opportunity. In other words, damages, net profits or whatever? Yes. So this is different from tortious interference in your mind because in corporate opportunity, it's the benefit to be derived by the fiduciary as opposed to the loss of the party in the tortious interference. Absolutely. And that's what it has to be for fiduciary duty cases because otherwise there isn't a deterrent effect. And you encourage this loyalty by allowing fiduciaries to profit from the wrongdoing. That's the holding that runs through the Chicago Exerell Cohen v. Keene case, through Graham v. Mims, which would impose constructive trust to prevent the possibility of profit. It goes through the state's entire jurisprudence on fiduciary duty law. Any other questions? I thank you for your attention and request that the Court. Thank you. We have other cases on the call. There will be a recess.